UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO.: 5:08-CV-00130-TBR

JUANITA WEATHERSTRAND,
as Administratrix of the Estate of
ROBERT KENDRICK, deceased                                                    PLAINTIFF

v.

CHRISTIAN COUNTY FISCAL COURT, et al.                              DEFENDANTS

MEMORANDUM OPINION

This matter is before the Court upon Defendants', Christian County Fiscal Court, Christian County Jail, and Bradley Boyd, in his individual capacity and official capacity as Christian County Jailer, Motion for Summary Judgment (Docket #19). Plaintiff, Juanita Weatherstrand, Administratrix of the Estate of Robert Kendrick, deceased, has filed a response (Docket #20). Defendants have filed a reply (Docket #23). This matter is now ripe for adjudication. For the following reasons, the Defendants' Motion for Summary Judgment is GRANTED.

Also before the Court is Defendants' Motion to Strike Affidavit of Juanita Weatherstrand (Docket # 26). Plaintiff has filed a response (Docket # 45). This matter is ripe for adjudication. For the following reasons, Defendants' Motion to Strike is DENIED.

BACKGROUND

Decedent, Robert A Kendrick, was diagnosed with schizophrenia while attending college. On August 8, 2007, Kendrick stopped taking his medication and was arrested for disorderly conduct, public intoxication and second-degree fleeing and evading. The arresting officers of the Hopkinsville Police Department transported Kendrick to the Jennie Stuart Medical Center where he was released into the custody of the staff, instead of being taken to the Christian County Jail. Kendrick was given a copy of the citation that charged him with the previously mentioned offenses and was instructed

to appear in Christian County District Court on August 20, 2007, at 1:00 p.m. Just after midnight on August 9, 2007, Kendrick was admitted to the Jennie Stuart Medical Center and later that day was discharged and transferred to Western State Hospital. Kendrick was not released from Western State Hospital until August 22, 2007.

On August 20, 2007, Christian County District Court issued a bench warrant with a bond of $4,000.00 because Kendrick failed to appear in court. Kendrick was arrested on October 2, 2007, on the warrant and was lodged in the Christian County Jail ("Jail") under the $4,000.00 bond. Kendrick stated during his intake medical screening that he suffered from mental illness, had been hospitalized at Western State Hospital two months earlier, and was currently taking two psychiatric medications: Haldol and Cogentin. He was given one dose of Haloperidol (the generic equivalent of Haldol) the evening of October 2, 2007. The Jail logs show he did not receive his medication again until a valid prescription was obtained on October 23, 2007.

Kendrick was housed in a six by eight isolation cell during his incarceration at the Jail pursuant to Kentucky Administrative Regulations and Jail policy regarding mental ill inmates. Defendant Bradley Boyd stated during his deposition, and the Jail's surveillance logs indicate, that inmates in isolation cells are observed every twenty minutes by members of the Jail staff. Inmates in insolation are given the opportunity to leave the cell for one hour each day for exercise or to shower.

According the Jail records, on October 15, 2007, while in his cell, Kendrick removed his clothing and began throwing his food out of his cell. On the same date, according to the Case Management Notes, the Jail staff contacted the Pennyroyal Medical Health Center to inform them of Kendrick's presence at the jail and to request assistance with his mental health issues.

On October 17, 2007, the Christian County District Court entered an order for Kendrick to be evaluated in order to determine his competency to stand trial. The Pennyroyal Center received the order the following day.

On October 21, 2007, a second incident occurred in Kendrick's cell in which Jail deputies were compelled to use pepper spray and restraints to resolve the situation. After this second incident, Jail staff contacted the Christian County District Court and requested another mental evaluation for Kendrick. On October 22, 2007, an Order for Competency Evaluation was signed by Judge Adams of the Christian District Court. On October 23, 2007, Dr. John Stea saw Kendrick at the Jail and Dr. Stea prescribed a regimen of two psychotropic medications: Haldol and Cogentin. No refills were authorized by the prescription. The prescription was filled on October 23, 2007, and Kendrick received both medications daily, with the exception of one day, until the prescription ran out on November 24, 2007. A Christian County District Court entered a second order for Psychiatric Evaluation on October 25, 2007.

Dr. Stea saw Kendrick again on November 20, 2007, and noted Kendrick to be in a "fairly stable" condition and he recommended a continuation of his current medication with a follow-up examination in three months. Dr. Stea observed that Kendrick was "awake, alert and oriented" and that his thought processes were "logical [and] goal directed." Dr. Stea did not write a new prescription at this time.

On November 21, 2007, the day before Thanksgiving, Plaintiff Juanita Weatherstrand visited Kendrick in the jail. Weatherstrand, Kendrick's surviving sister, states that Kendrick's "eyes were

popped out" and he appeared to have lost over one-hundred pounds in weight.[1] Weatherstrand states in her response she barely recognized Kendrick and she had to work hard to get him to recognize her. She states that when she finally got Kendrick to respond he repeatedly stated, "I am so glad you are my sister," and pleaded, "Why am I here?" Within three days of Weatherstrand's visit with Kendrick, Fred Greenwade, Weatherstrand's ex-husband, allegedly called Boyd to discuss Kendrick's condition and the failure of the Jail to get him his medication.

On November 24, 2007, Kendrick was given his last dose of Haldol. On November 28, 2007, Deputy Jailer Captain Howard contacted the Bluegrass Crisis Network seeking advice regarding Kendrick's treatment and condition. Cindy Starling, a licensed clinical social worker with Bluegrass examined Kendrick at the jail later that day. She made the determination that Kendrick did not meet the criteria to be sent to Western State Hospital as he did not present a danger to himself or others. Starling described Kendrick as "alert, coherent, and relevant in speech," and described his grooming as "good".

Pursuant to court order, Dr. Robert Sivley of the Pennyroyal Center examined Kendrick at the Pennyroyal Center on December 1, 2007, in order to determine his competency to stand trial. Dr. Sivley's report acknowledges Kendrick's history of mental illness and found him marginally competent to stand trial. His report described Kendrick's demeanor during the evaluation as "friendly," "cooperative," and "in a reasonably good mood." Dr. Sivley stated his conversation was "relevant and coherent" and his "ability to respond to questions [as] within normal limits." Additionally, he described Kendrick as "in a stable and nonpsychotic frame of mind." Dr. Sivley

---

[1] Defendants note that when Kendrick entered the jail he weighed 210 pounds and at the time of the autopsy he weighed 212 pounds.

recommended Kendrick remain on Haldol and Cogentin, however, he did not write a prescription for either medication.

On December 4, 2007, Dr. Stea saw Kendrick at the Jail for a follow-up examination. Dr. Stea recommended Kendrick remain on a regimen of Haldol and Cogentin and wrote prescriptions for both drugs which were filled that day. The Jail records do not indicate that Kendrick was given Haldol at any time after November 24, 2007.

On December 10, 2007, Kendrick took a shower at approximately 1:10 a.m. and was placed back in his cell. Shortly thereafter, deputies were leaving the isolation area when they heard a thud from Kendrick's cell. The deputies investigated the noise and found Kendrick lying on his bunk. Although Kendrick did not appear to be breathing, the deputies were able to find a light pulse. The deputies retrieved the automatic external defibrillator and CPR equipment and started rescue breathing while an ambulance was called. The paramedics arrived at approximately 1:44 a.m. Kendrick was taken to Jennie Stuart Medical Center by ambulance and was pronounced dead at 2:10 a.m. An autopsy was conducted by Dr. Deirdre Schluckebier for the Kentucky State Medical Examiner's Office which revealed the cause of death as pulmonary embolism.

Juanita Weatherstrand, Plaintiff and Administratrix of the Estate of Robert Kendrick, filed this action pursuant to 42 U.S.C. § 1983 claiming Defendants Christian County Fiscal Court, Christian County Jail, and Bradley Boyd in his individual and official capacities, violated the civil rights of the decedent, causing his wrongful death. Weatherstrand also claims negligence, gross negligence and outrage (intentional infliction of emotional distress).

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The nonmoving party must present more than a mere scintilla of evidence in support of his position; the nonmoving party must present evidence on which the trier of fact could reasonably find for the nonmoving party.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I. Liability of Defendants Christian County Fiscal Court and Christian County Jail

When an individual brings suit against the governing body of a county or one of its municipal departments, the Court must construe the complaint as one brought against the county itself. *Smallwood v. Jefferson County Gov't*, 743 F. Supp. 502, 503 (W.D. Ky. 1990). The doctrine of sovereign immunity holds that a state is immune from liability unless the immunity has been

waived by the legislature. *Yanero v. Davis*, 65 S.W.3d 510, 517 (Ky. 2001). Conflicting Kentucky case law holds both that counties are treated as municipalities, *Howell v. Haney*, 330 S.W.2d 941, 943 (Ky. 1960), and that they are treated as political subdivisions of the state entitled to sovereign immunity, *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008)(citing *Lexington-Fayette Urban County Gov't v. Smolcic*, 142 S.W.3d 128 (Ky.2004)); *see also St. Matthews Fire Protection Dist. v. Aubrey*, 2009 WL 79493, Case No. 2006-CA-000518-MR, *3 (Ky. App. March 27, 2009).

Kentucky courts have held that the more recent decision is the precedent which should be followed when decisions conflict. *Smith v. Overstreet's Adm'r*, 81 S.W.2d 571, 572 (Ky. 1935). The most recent precedent from the Kentucky Supreme Court on this issue comes from *Jones v. Cross*. 260 S.W.3d 343, 345 (Ky. 2008). In light of these decisions, and after looking closely at the decisions of the Kentucky Supreme Court, this Court finds that a county is considered a political subdivision of the state and is thus entitled to sovereign immunity.[2] Therefore, summary judgment is granted as to all of Plaintiff's claims against Christian County Fiscal Court and Christian County Jail.

## II. Liability of Defendant Bradley Boyd in his Official Capacity

A claim brought against individuals in their official capacity is considered a claim against the underlying government entity; it is not a suit against the individual, but against the individual's office. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, the claims against Bradley Boyd in his official capacity are in essence claims against Christian County.

---

[2] Even if the Court were to find Christian County a municipality, summary judgment would be granted as to the claims against Defendants under § 1983 because Plaintiff has failed to establish a policy or custom of the county which led to the violation of a clearly established right.

In *Commonwealth v. Harris*, the Kentucky Supreme Court held that a jailer is cloaked with sovereign immunity. 59 S.W.3d 896, 899 (Ky. 2001). The court explained,

> The jailer is a constitutionally elected officer of the county under Section 99 of the Kentucky Constitution. And, the jailer reports to the fiscal court, which oversees the jail's operation and budget. Thus, the official capacity claims are in essence claims alleging negligent operation of the jail and are, therefore, claims against the county. This cloaks the jailer, in his official capacity, with the county's sovereign immunity.

*Id.* (internal citations omitted). This sovereign immunity is only applicable to jailers in their official capacities; jailers may be liable in their individual capacities for ministerial acts or entitled to qualified immunity for discretionary acts within the scope of their employment. *Id.* The Court finds, pursuant to the doctrine of sovereign immunity, that summary judgment for Defendants is proper as to all claims against Bradley Boyd in his official capacity.

### III. Liability of Bradley Boyd in his Individual Capacity

#### a. Section 1983 Claim

"To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir.1992). Additionally, a successful claimant "must establish that the defendant acted knowingly or intentionally to violate his or her constitutional rights such that mere negligence or recklessness is insufficient." *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999) (citing *Harlow*, 457 U.S. at 815-19). The Sixth Circuit additionally requires that a Plaintiff "who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed" against a motion for summary judgment. *Napier v. Madison County, Ky.*, 238 F.3d 739,743 (6th Cir. 2001).

There appears to be no dispute that Boyd is a person within the scope of § 1983 and that he was acting under the color of state law. Additionally, the Court finds there is a clearly established right of pretrial detainees to have access to adequate medical treatment. *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983). Therefore, the only remaining question is whether Weatherstrand has presented sufficient evidence to survive a motion for summary judgment on the issue of whether Kendrick was deprived of the right to adequate medical treatment under the standard set forth by the Eighth Amendment.

As stated, this case involves a question of inadequate medical treatment concerning a pretrial detainee. The right of pretrial detainees to adequate medical care has been extended through the Fourteenth Amendment; however, the Court must look to the standard set forth by cases interpreting the Eighth Amendment. *Roberts v. City of Troy*, 773 F.2d 720, (6th Cir. 1985).

### i. Eighth Amendment Standard

The Supreme Court has established a two part objective and subjective standard for determining a violation of the Eighth Amendment. Two requirements must be met in order to show a violation of the Eighth Amendment by prison officials: "First, the deprivation alleged must be, objectively, 'sufficiently serious,'" and, second, the prison official must have acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1970).

The second subjective prong of the analysis has been defined by the Court as "a state of mind more blameworthy than negligence," but also "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. Therefore, purposeful or knowing conduct is not the standard for deliberate indifference. *Id.* Deliberate indifference falling somewhere between negligence and purposeful or knowing conduct, the Court has equated it with

9

recklessness: "[i]t is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836.  The Supreme Court summarized the standard holding:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.  The Court stated that it was not enough to allege an "official's failure to alleviate a significant risk that he should have perceived but did not." *Id.* at 838.  The Court went on to say, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.  In short, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845.

Defendants, without addressing the objective seriousness of the deprivation, assert that Plaintiff is unable to point to any evidence which supports Plaintiff's claim that Defendants acted with deliberate indifference.  Defendants also assert that both the Supreme Court and Sixth Circuit have rejected contentions of deliberate indifference under circumstances more egregious than those presented in the case at bar.  Additionally, Defendants contend that without an expert Plaintiff is unable to meet her burden as set forth in *Napier*, requiring a plaintiff to "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier*, 238 F.3d at 742.

Plaintiff responds by arguing that "once actual knowledge of the risk can be shown . . . the question of whether there was conscious disregard of . . . risk [is] to be determined by the jury."

*Cooper v. County of Washtenaw*, 222 F. App'x. 459, 467 (6th Cir. 2007).  Defendants contend that Plaintiff is not able to point to evidence that shows actual knowledge and, therefore, the question of conscious disregard does not arise. Plaintiff asserts knowledge has been established.

Plaintiff states that the Jail and Boyd had full knowledge that Kendrick suffered from mental illness and that he needed his anti-psychotic medication upon his arrest. Plaintiff points to the fact that the Jail involuntarily transferred Kendrick to Western State Hospital two months before the arrest that precipitated this event.[3] Additionally, Plaintiff points to the fact that Kendrick had informed the Jail upon being processed on October 2, 2007, that he was taking Haldol for his mental illness.  Plaintiff also points to the comments made by Weatherstrand, as sister of Kendrick, to the Jail in an effort to ensure her brother remained on his medication otherwise he would deteriorate and die.  Plaintiff further points to: the call by Greenwade to Boyd regarding Kendrick's condition during which he stated Kendrick could die if he did not receive his medication; the reports of Dr. Sivley and Dr. Stea regarding the need to continue medication; and the Order of the Christian County Court requiring that Kendrick continue to receive his medication.

Plaintiff has established that the Jail, and likely Boyd, knew that Kendrick had a mental illness and needed medication.  In order to hold Boyd liable in his individual capacity, however, Plaintiff must show that Boyd knew, or could infer, that failure to provide medication would result in death.  In other words, Plaintiff must demonstrate Boyd knew of and disregarded excessive risk to Kendrick's safety.

Taking the facts in light most favorable to Plaintiff, the Court must accept as true that

---

[3] Defendants contend that the records indicate that the during the incident in August, 2007, Kendrick was not ever transported to the Jail, but was transported to Jennie Stuart Hospital who then involuntarily transferred him to Western State Hospital.

11

Weatherstrand told the Jail staff that Kendrick would die if he was not given his medication. Additionally, the Court must accept as true that Greenwade informed Boyd that Kendrick would die if he was not given his medication. Plaintiff has presented evidence that Boyd could infer that failure to provide Kendrick his medication would result in death.

However, under the standard set forth in *Napier*, Plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." 238 F.3d at 743. Plaintiff has been unable to point to any such evidence. Plaintiff attempts to use the testimony of Dr. Westerfield, expert for the Defendants, to argue that the inactivity of Kendrick resulted in his pulmonary embolism. The report of Dr. Westerfield states, however, that the cause of the pulmonary embolism is not determined because Kendrick had no history to suggest a diagnosis of pulmonary embolism. Additionally, Dr. Westerfield states, the medicines Kendrick had been taking did not increase the risk of pulmonary embolism. Finally, Dr. Westerfield states "based on the available information . . . there is nothing that happened at the Christian County Jail that caused or contributed, directly or indirectly, to Mr. Kendrick's death. There is no evidence that any action or inaction caused Mr. Kendrick to develop blood clots which were fatal to him." Therefore, Boyd, in his individual capacity, is entitled to summary judgment on the Plaintiff's § 1983 claims.[4]

**b. State Tort Claims**

Plaintiff has also brought claims of negligence, gross negligence and outrage (intentional infliction of emotional distress) against Boyd in his individual capacity.

**i. Negligence and Gross Negligence**

---

[4] Because the Court has granted the Defendants' Motion for Summary Judgment as to this claim on the basis that the Plaintiff has not presented sufficient evidence, the Court need not determine whether Boyd is entitled to qualified immunity.

In order to establish a claim for negligence, Plaintiff must show "a duty on the defendant, a breach of the duty, and a causal connection between the breach of the duty and an injury suffered by the plaintiff." *Lewis v. B & R Corp.*, 56 S.W.3d 432, 437 (Ky.App. 2001). Failure to establish any of these elements is fatal to Plaintiff's claim. *M & T Chems., Inc. v. Westrick*, 525 S.W.2d 740, 741 (Ky. 1974).

The duties of a jailer are set forth by statute, which states:

> At the time of booking, the jailer shall receive and keep in the jail all persons who are lawfully committed thereto, until they are lawfully discharged, unless the person is in need of emergency medical attention, in which case the arresting officer shall obtain medical attention for the person prior to delivery to the jail. The jailer shall treat them humanely and furnish them with proper food and lodging during their confinement. He shall deliver those who die in jail to their friends, if requested, or have them decently buried at the expense of the county.

Ky. Rev. Stat. §71.040. This statue has been interpreted by Kentucky courts to impose a "duty to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Rowan County v. Sloas*, 201 S.W.3d 469, 479 (Ky. 2006); *Lamb v. Clark*, 138 S.W.2d 350, 352 (Ky. 1940) (citing *Ratliff v. Stanley*, 7 S.W.2d 230, 231 (Ky. 1928)).

Defendants assert that Plaintiff has offered no evidence to indicate that Boyd breached the duty to he owed to Kendrick. The Plaintiff does not directly address this assertion in her response;[5] however, the Court believes it is Plaintiff's contention that Boyd breached his duty to treat Kendrick humanely by failing to provide adequate medical treatment. Taking the facts in the light most

---

[5] Plaintiff in her response did not address Defendants' Motion for Summary Judgment as to any of her state tort law claims. Plaintiff has thus failed to met her burden under summary judgment of presenting more than a mere scintilla of evidence in support of her position, i.e., her burden of presenting evidence on which the trier of fact could reasonably find for her.

favorable to Plaintiff, the facts and evidence indicate that Kendrick was only provided his medication for a thirty day period while he was in custody: October 23, 2007, to November 24, 2007, with one exception on November 17, 2007. The evidence shows this prescription was written by Dr. Stea and it was not refilled by Dr. Stea on November 20, 2007. The evidence also shows that Dr. Sivley on December 1, 2007, recommended Kendrick remain on his medication; however, Dr. Sivley did not write a prescription for further medication. On December 4, 2007, Dr. Stea wrote a prescription, which was filled; however, Kendrick did not received Haldol at this time despite the prescription. Taking these facts in the light most favorable to Plaintiff, Plaintiff may have stated a claim for breach of duty to treat Kendrick humanely by depriving him of adequate medical treatment after December 4, 2007, when the prescription had been refilled but Kendrick did not receive his medication. Proof of negligence, however, also requires Plaintiff to establish causation, much like the Eighth Amendment standard for inadequate medical treatment. Plaintiff remains unable to establish causation.

Plaintiff is unable to establish that the failure of Kendrick to receive his medication resulted in the pulmonary embolism that ultimately caused his death. In order to establish such causation, Plaintiff would have to point to medical expert testimony; Plaintiff has not done so. *Johnson v. Vaughn*, 370 S.W.2d 591, 597 (Ky. 1963) (holding negligence "must be established by medical or expert testimony unless the negligence and injurious results are so apparent that laymen with a general knowledge would have no difficulty in recognizing it.")

Plaintiff attempts to use the testimony of Dr. Westerfield, expert for the Defendants, to argue that the inactivity of Kendrick resulted in his pulmonary embolism. The facts, even taken in the light most favorable to Plaintiff, do not support this conclusion, nor does Dr. Westerfield's

14

testimony. The Jail shower logs attached to Plaintiff's Response show that Kendrick left his cell at least six times in October, at least five times in November, and seven times in the first ten days in December. Kendrick, although in an segregation cell, had sufficient room to stand, sit, walk, pace or perform other activities if he so desired. This is not the type of inactivity described by Dr. Westerfield in his report: "[h]ospitalized patients who are immobilized . . . [p]assengers on long air flights or long bus rides . . . ." Dr. Westerfield concludes the cause of the pulmonary embolism is not determined and "based on the available information . . . there is nothing that happened at the Christian County Jail that caused or contributed, directly or indirectly, to Mr. Kendrick's death. There is no evidence that any action or inaction caused Mr. Kendrick to develop blood clots which were fatal to him."   The Court finds that because Plaintiff is not able to establish a genuine issue of material fact as to at least one element of the claim of negligence, summary judgment for Defendants is proper. Summary judgment in favor of Defendants is similarly proper on Plaintiff's claims for gross negligence. Gross negligence is a heightened level of negligence defined as a "conscious and voluntary act or omission which is likely to result in grave injury when in face of clear and present danger of which alleged tortfeasor is aware" or failure to exercise slight care. *Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343, 348 (Ky. App. 2000); *Louisville & Nashville R.R. Co. v. George*, 129 S.W.2d 986 (Ky. 1939). However, gross negligence still requires a plaintiff to establish causation between breach of the duty of care and the injury caused. Here, Plaintiff is unable to establish causation, and is, therefore, unable to establish a cause of action for gross negligence.

### ii. Outrage

Finally, as to Plaintiff's claim of outrage, or intentional infliction of emotional distress,

Defendants argue that the claim is not available since Plaintiff has alleged negligence which otherwise provides for recovery of damages related to one's emotional distress. The court in *Rigazio v. Archdiocese of Louisville*, explained:

> Taking into account the history of the tort of outrage, and its reason for being as a "gap-filler" providing redress for extreme emotional distress in those instances in which the traditional common law actions did not, we believe that § 47 [of the Restatement (Second) of Torts] recognizes that where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie. Recovery for emotional distress in those instances must be had under the appropriate traditional common law action. The tort of outrage was intended to supplement the existing forms of recovery, not swallow them up.

853 S.W.2d 295, 298-99 (Ky. App. 1993). In the case at bar, it is clear that Plaintiff has alleged commission of one of the traditional torts: negligence. However, Defendants have been granted summary judgment as to this claim, therefore, it is no longer a viable cause of action for Plaintiff. The Court must determine if Plaintiff has presented evidence with which to survive a motion for summary judgment as to her claim for outrage.

A prima facie case of outrage requires that Plaintiff show: (1) that the wrongdoer's conduct was intentional or reckless; (2) that the conduct was outrageous and intolerable and offends against the generally accepted standards of decency and morality; (3) a causal connection between the wrongdoer's conduct and the emotional distress; and (4) that the emotional distress was severe. *Stringer*, 151 S.W.3d at 788 (citing *Seitz*, 796 S.W.2d at 2-3). The Court must determine "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* at 788-89 (citing Restatement (Second) of Torts § 46(1) cmt. h (1965)).

Kentucky courts have "set a high threshold for outrage claims," *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 791 (Ky. 2004), and in Kentucky, "a claim for the tort of outrage requires the

16

plaintiff to prove conduct which is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Humana of Ky., Inc. v. Seitz*, 796 S.W. 2d 1, 3 (Ky. 1990) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). The Kentucky Supreme Court reasoned in *Kroger Co. v. Willgruber* that "citizens in our society are expected to withstand petty insults, unkind words and minor indignities. Such irritations are a part of normal, every day life and constitute no legal cause of action. It is only outrageous and intolerable conduct which is covered by this tort." 920 S.W.2d 61, 65 (Ky. 1996).

For example, Kentucky courts have found nothing to support a claim of outrage where the defendant:

> (1) refused to pay medical expenses arising out of an injured worker's compensation claim; (2) wrongfully converted the plaintiffs property in a manner that breached the peace; (3) negligently allowed his vehicle to leave the road and struck and killed a child; (4) committed "reprehensible" fraud during divorce proceedings by converting funds belonging to his spouse for the benefit of defendant and his adulterous partner; (5) wrongfully terminated the plaintiff; (6) displayed a lack of compassion, patience, and taste by ordering plaintiff, who was hysterical over the fact that she had just delivered a stillborn child in her hospital room, to "shut up" and then informing her that the stillborn child would be "disposed of in the hospital"; (7) erected a billboard referencing defendant's status as a convicted child molester; (8) wrongfully garnished plaintiffs wages pursuant to a forged agreement; and (9) impregnated plaintiff's wife.

*Stringer*, 151 S.W.3d at 790-91 (internal citations omitted).

Plaintiff did not address the Defendants' Motion for Summary Judgment regarding any of her state tort law claims. Plaintiff has thus failed to met her burden under summary judgment of presenting more than a mere scintilla of evidence in support of her position, i.e., her burden of presenting evidence on which the trier of fact could reasonably find for her. Alternatively, taking the facts in the light most favorable to the Plaintiff, the Court finds that Plaintiff is unable to

establish a prima facie case for outrage: nowhere is there evidence that the actions of Boyd were intentional or reckless. There is no evidence that Boyd had any knowledge that failure of Kendrick to obtain his medication would result in severe emotional distress to Plaintiff or that he acted with conscious disregard of the risk that severe emotional distress might result to Plaintiff.

The Court finds that Defendants are entitled to summary judgment on all of Plaintiff's claims against Boyd in his individual capacity. Plaintiff is unable to establish a claim under § 1983 as she has not met her burden of proving that the conduct of Boyd has violated the right of Kendrick to receive adequate medical treatment. Plaintiff is unable to establish a claim for negligence or gross negligence because she is unable to establish causation. Finally, Plaintiff is unable to establish a claim for outrage because she cannot show the acts of Boyd were intentional or reckless.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED and Defendants' Motion to Strike is DENIED

An appropriate order shall issue.